People v Roman Catholic Diocese of Albany, N.Y. (2025 NY Slip Op 25117)

[*1]

People v Roman Catholic Diocese of Albany, N.Y.

2025 NY Slip Op 25117

Decided on May 14, 2025

Supreme Court, Schenectady County

Versaci, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on May 14, 2025
Supreme Court, Schenectady County

People of the State of New York, 
 BY LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK, Plaintiff,

against
Roman Catholic Diocese of Albany, New York, BISHOP EDWARD SCHARFENBERGER, JENNIFER E. HUBBARD, AS ADMINISTRATOR OF THE ESTATE OF HOWARD J. HUBBARD, THERESA D'ORSI, AS ADMINISTRATOR OF THE ESTATE OF DAVID R. LEFORT, JOSEPH POFIT, THE ST. CLARE'S CORPORATION, AND THE ST. CLARE'S RETIREMENT INCOME PLAN TRUST, Defendants.
MARY HARTSHORNE, et al., Plaintiffs,
against
ROMAN CATHOLIC DIOCESE OF ALBANY,
NEW YORK, et al., Defendants.

Index No. 2022-830

Attorneys for the Plaintiff, People of the State of New York:
Letitia James
Attorney General of the State of New York
James Sheehan, Esq., Assistant Attorney General
Diane Hertz, Esq., Assistant Attorney General 
The Capitol
Albany, New York 12224
Attorneys for Plaintiffs, Kelvin Isolda and Laurie Wasniski:
Victoria M. Esposito, Esq.
Albany Law School
80 New Scotland Avenue
Albany, New York 12208
Attorneys for Plaintiffs, Leonard Adams, Jeaenette Bearzi, David Bonitatibus, Patricia Bonitatibus, Mary Hartshorne, Kelvin Isolda, Sandra Shepler and Denise Whitehouse:
Gary Stone, Esq.
Christopher Dagg, Esq.
Brooklyn Legal Services
105 Court Street, 4th Floor
Brooklyn, New York 11201-5658
Attorneys for Plaintiffs, Patricia Caulfield, Colleen Dzikas and Angela Stewart:
David Pratt, Esq.
Albany Law School
80 New Scotland Avenue
Albany, New York 12208
Attorneys for Plaintiffs, Linda Bucciferro, Adreana Cole, Amy Henry and Frank Houlihan, as Voluntary Administrator for the Estate of Mary Houlihan:
Herzog Law Firm, P.C.
James M. Reilly, Esq., Of Counsel
7 Southwoods Boulevard
Albany, New York 12211
Attorneys for All Other Named Plaintiffs in the Hartshorne Action:
AARP Foundation
Victoria Williamson, Esq.
Ali Naini, Esq., Of Counsel
Sebastien Monzon Rueda, Esq., Of Counsel
601 E Street NW
Washington, D.C. 20049
Attorneys for Defendant, The Roman Catholic Diocese of Albany, New York:
Tobin and Dempf, LLP
Michael Costello, Esq., Of Counsel
515 Broadway
Albany, New York 12207
Attorneys for Defendant, Jennifer Hubbard, as Administrator of the Estate of Howard J. Hubbard:
Law Offices of Timothy J. O'Connor
Timothy J. O'Connor, Esq., Of Counsel
29 Wards Lane
Albany, New York 12204
Attorneys for Defendants, Bishop Edward Scharfenberger and the Estate of Very Reverend David LeFort:
Heidell, Pittoni, Murphy & Bach, LLP
Marshall Broad, Esq., Of Counsel
5 Wembley Court
P.O. Box 15054
Albany, New York 12212-5054
Attorneys for Defendants, Robert Perry, Joseph F. Pofit, St. Clare's Corporation and St. Clare's Retirement Income Plan:
Barclay Damon LLP
Brian E. Whiteley, Esq., Of Counsel
Colm P. Ryan, Esq., Of Counsel
Kyra E. Ganswith, Esq., Of Counsel
80 State Street
Albany, New York 12207-2543
Intervenor:
Jack Henry
Self-Represented Litigant

Vincent W. Versaci, J.

Pending before the Court are seven (7) Motions, namely: 1) a Motion for Summary Judgment filed by Defendant, The Roman Catholic Diocese of Albany, New York (hereinafter referred to as "the Diocese"), seeking an Order pursuant to CPLR Rule 3212 dismissing the consolidated action against the Diocese in its entirety (Motion #13); 2) a Motion for Summary Judgment filed by Defendant, Jennifer Hubbard, as Administrator of the Estate of Howard J. Hubbard (hereinafter referred to as "Defendant Hubbard"), seeking an Order pursuant to CPLR Rule 3212(a), (b) and (g) dismissing all claims and causes of action asserted against Defendant Hubbard as having no merit (Motion #14); 3) a Motion for Summary Judgment filed by Defendants, Bishop Edward Scharfenberger and the Estate of Very Reverend David LeFort (hereinafter referred to as "Defendant Scharfenberger and Defendant LeFort"), seeking an Order pursuant to CPLR Rule 3212(a) and (g) dismissing all claims against them (Motion #15); 4) a Motion for Partial Summary Judgment filed by the Plaintiffs in the Hartshorne action (hereinafter referred to as "the Hartshorne Plaintiffs"), seeking an Order granting partial summary judgment against Defendant, St. Clare's Corporation, on the Hartshorne Plaintiffs' first cause of action for breach of contract (Motion #16); 5) a Motion for Partial Summary Judgment filed by Defendants, Robert Perry and Joseph F. Pofit (hereinafter referred to as "Defendant [*2]Perry and Defendant Pofit"), seeking an Order pursuant to CPLR Rule 3212 dismissing the claims asserted against Defendant Perry and Defendant Pofit for breach of fiduciary duty in the Hartshorne Plaintiffs' Second Amended Complaint (Motion #17); 6) a Motion for Summary Judgment filed by Defendant Pofit, seeking an Order pursuant to CPLR Rule 3212 dismissing all claims asserted against him in the Amended Complaint filed in the action commenced by the New York State Attorney General (hereinafter referred to as "the OAG action") (Motion #18); and 7) a Joint Motion filed by the Hartshorne Plaintiffs and the Attorney General's Office, seeking an Order excluding the Expert Affidavits of Jeffrey Schaff, G. Daniel Miller, and John A. Renken; the Attorney Affidavit of Timothy O'Connor, Esq.; the Affidavit of Jennifer Hubbard; and the Attorney Affirmation of Marshall Broad, Esq. (Motion #19). All of these motions have been fully briefed and oral argument was held on April 17, 2025. After due deliberation upon all the papers and proceedings filed and conducted in this matter, the Court hereby finds and decides as follows:
Facts
St. Clare's Hospital of Schenectady, NY [FN1]
was established in 1945 as a not-for-profit corporation, co-sponsored by the Franciscan Sisters of the Poor and the Diocese. The Diocese donated the land upon which the Hospital was built. Pursuant to its By-Laws, the Corporation is governed by a Board of Directors. The Bishop of the Diocese is an automatic director of the Corporation and serves on its Board of Directors as the Honorary Chair. He has the sole power to appoint the Chairman and approve every member of the Board in addition to all executive hires at the Corporation. The Bishop has complete control of all decisions as to the disposition of the Corporation's property. Upon dissolution of the Corporation, all corporate assets accrue to the Bishop. The Bishop must approve all changes to the By-Laws that effect his decision-making authority over the Corporation. Bishop Hubbard served as the Bishop of the Diocese from 1977 until his retirement in 2014, at which time Bishop Scharfenberger was installed as the Bishop of the Diocese and continues to serve in this capacity at the present time.
In 1959, the Hospital established the St. Clare's Hospital Retirement Income Plan (hereinafter referred to as the "Plan" or the "Pension Plan"), a defined benefit pension plan for the exclusive benefit of its eligible employees and their beneficiaries. The Plan is managed by the Corporation's Board of Directors, with the advice of the actuaries hired by the Board. In 1991, the Board of Directors applied to the Internal Revenue Service (hereinafter referred to as the "IRS"), for a ruling to deem the Plan a "church plan", which would exempt the Plan from the mandatory minimum funding requirements of the Employee Retirement Income Security Act of 1974 as amended (hereinafter referred to as "ERISA"), and from the obligation to pay into and carry pension insurance through the Pension Benefit Guaranty Corporation insurance program (hereinafter referred to as "PBGC"). In this application, the Corporation represented to the IRS that the Hospital and the Plan Administrator are "controlled by the Roman Catholic Church" and that the Plan "is established and maintained for its employees (or their beneficiaries) by the [*3]church".[FN2]

Based upon these representations, the IRS granted church plan status to the Plan in 1992, retroactive to January 1, 1974, thereby exempting it from all ERISA and PBGC insurance requirements. In issuing this ruling, the IRS determined that the employees of the Hospital were deemed to be employees of the Diocese for the purpose of designating the Plan as a church plan. The Hospital could have elected to remain covered by the PBGC but it chose not to do so. Rather, armed with the IRS Ruling Letter, the Corporation and the Diocese, through Bishop Hubbard, entered into a settlement agreement with the PBGC for the refund of insurance premiums that had been paid, reaffirming the representations that were contained in the application to the IRS.The Hospital continued to make contributions to the Plan from 1992 through 1997, despite its exemption from ERISA funding requirements. However, beginning in 1998, the Corporation, contrary to the recommendations of its actuaries, ceased making any employer contributions to the Plan or made only nominal contributions. The Plan continued to accrue liabilities however, which were no longer being offset by the Corporation's contributions. Despite this imbalance, which occurred while Bishop Hubbard was the self-appointed Chair of the Board and presided over Board meetings, the Corporation continued to promise its employees an absolute right to a calculated life-time retirement benefit as reflected in the 2000 Amended and Restated Plan and the 2005 Summary Plan Description ("SPD") (hereinafter referred to as "the Plan documents")[FN3]
.
Specifically, the 2000 Amended and Restated Plan provides that all eligible participants "shall receive payment of such benefit" that becomes 100% vested after five (5) years of credited service. It further provides that:
No pension or other benefit granted prior to the time of any amendment or modification of the Plan shall be reduced, suspended, or discontinued as a result thereof, except to the extent necessary to enable the Plan to meet the requirements for qualification under the Code or the requirements of any governmental authority.
The 2005 SPD provides in pertinent part as follows:
While the Employer fully intends to continue the Plan indefinitely, it does reserve the right to modify, suspend, or terminate the Plan at any time. 
However, no modification, suspension or termination of the Plan may reduce any Plan Benefits you have already accrued. Should the Plan be terminated, you will not earn any additional benefits, but you will be 100% vested in your Accrued Plan Benefit at the time of the Plan's termination. The assets of the Plan will be allocated to provide all Accrued Plan Benefits and meet any other legal requirements. [Emphasis added].
Thus, the Plan documents reassured the participants that as long as their pension rights were vested, as were all the Plaintiffs, they would receive their full retirement benefits for the duration of their lives and that any subsequent modification, amendment or termination of the Plan would not reduce or extinguish their accrued benefits.
Pursuant to the financial management contract that the Corporation had with its actuaries, Prudential and Milliman, the Plan assets were primarily invested in low-yielding guaranteed accounts with a below market rate of return. Given this fact, and the lack of contributions to the Plan, by the end of 2006, the Plan was underfunded by approximately $43 million. This underfunding lead to the Corporation's decision to freeze the Plan, effective January 31, 2006. The Corporation informed its employees that they would no longer accrue any additional years of service for benefit calculation purposes, and that no new employees could join the Plan. In December, 2005, Defendant Perry, then President and CEO of the Hospital, sent a letter to the Plan participants reaffirming that "[n]o one will lose any accrued benefits under the existing plan" and that "[a]s long as you are vested (that is, completed five years of service) when you leave St. Clare's, you will receive your Pension Plan benefit (frozen at January 31, 2006) payable at retirement".
Also during 2006, the State of New York established the Commission on Health Care Facilities in the 21st Century, otherwise known as the "Berger Commission", to recommend ways to stabilize and strengthen the health care system within New York State. The Report of the Berger Commission recommended the consolidation of St. Clare's Hospital and Ellis Hospital. St. Clare's and Ellis Hospital began negotiating an Asset Transfer Agreement which did not include the Pension Plan due to its enormous deficit and the Corporation's desire to maintain its church plan status of being exempt from ERISA funding requirements.
In connection with the impending asset transfer and due to the severe underfunding of the Plan, the Corporation submitted a grant application to the State of New York. During the pendency of the application, Bishop Hubbard and Defendant Perry, as President of the Corporation, represented to the New York State Department of Health ("DOH") that, based on calculations performed by Edward Gasparovic, the Hospital's CFO and VP of Finance, $28.5 million would "fully fund the pension Plan". Mr. Gasparovic is not an actuary. This representation was contrary to the advice given by the Corporation's actuarial consultants, Milliman, and SMART, that $28.5 million would not fully fund the Plan. In fact, Milliman calculated that as of December 31, 2006, the Plan was underfunded by $43 million and would run out of money in eight to ten years. Milliman further recommended that the Corporation should terminate the Plan within 1-2 years after receiving the State grant, which would have ensured that retirees and those over the age of 60 would receive 100% of their pension benefits and all other pensioners would receive 64% of their benefits.
The Corporation did not heed the advice of its actuaries or the advice of its counsel, Attorney Raymond McCabe, Esq., and continued to administer the Plan. The Board also passed a resolution to further amend the Plan, against Attorney McCabe's advice, by increasing the retirement age to match that of the retirement age for social security benefits. Attorney McCabe advised the Board in April, 2007 that without the consent of the Plan participants, this unilateral change to provide for a reduced benefit violated the terms of the Plan and would likely result in the Hospital being "found in breach of contract". Defendant Perry sent letters to the Plan participants in February, 2008, advising them of the Plan amendment which he represented was "required . . . in order to fully fund the pension" . . . and "to assure that funding was available [*4]when people needed it most — after they have stopped working". He further represented that "[a]long with the $28.5 million we will receive from the State, the plan changes, and some newly negotiated terms with Prudential, we are now confident that the [defined benefit] pension will remain solvent for the benefit of the 1,100 vested participants".
In June, 2008, the Asset Transfer Agreement between St. Clare's and Ellis Hospital was approved by the Roman Catholic authorities at the Vatican in Rome, Italy, upon the Corporation's payment to the Vatican of $41,000.00 for permission to implement the Agreement. The Corporation ceased operating as a hospital, surrendered its license and transferred its assets to Ellis Hospital.
In July, 2008, the Corporation received the $28.5 million public grant from the New York State Department of Health, earmarked for funding the Pension Plan. These grant monies were used to purchase an investment annuity which replaced a guaranteed, group annuity contract that the Corporation previously had with Prudential Annuity and Insurance Company. The Corporation continued to administer the Plan and invest the remaining assets of the Plan in the financial markets without insurance covering the assets, resulting in the elimination of all guarantees provided by the Plan for the payment of full pension benefits. 
Following the closure of the Hospital, Bishop Hubbard directed Defendant Pofit, an employee of the Diocese whom he appointed to the Board in 2006, to oversee the winding up of the affairs of the Corporation. Defendant Pofit worked out of the Diocese's offices and used Diocesan personnel to assist him with his work for the Corporation. He described himself as a "conduit" between the Corporation and the Diocese who conveyed information to and from Bishop Hubbard.
On May 27, 2008, Bishop Hubbard disbanded the Board, leaving himself as the sole director of the Corporation until August, 2009, when he reconstituted the Board. Despite Bishop Hubbard having exclusive control over the Corporation during this time, he was unable to identify at his Examination Before Trial any steps he took to monitor or oversee the Plan while having such exclusive control. The Plan lost over $6 million during this time. After August, 2009, Bishop Hubbard did not attend any more Board meetings.
Although the Plan was not required to be funded through a trust pursuant to ERISA regulations, the Corporation nonetheless followed ERISA guidelines and in December, 2009, decided that it was in its best interests to place the investment annuity into a trust. Accordingly, the Corporation established the St. Clare's Retirement Income Plan Trust (hereinafter referred to as the "Trust"), and appointed its own Directors, with the exception of Bishop Hubbard, to serve as the Trustees. The Trustees were given the power to hold, manage and invest the Trust corpus exclusively for the retirement income benefits of the Plan participants and were required to make payments or disbursements of such benefits pursuant to the terms of the Plan. None of the Trustees were actuaries, accountants, or had any pension plan fiduciary or administrative experience. They did not hold any meetings during their tenure as Trustees, during which time the Plan's assets continued to diminish.
Following the creation of the Trust, the Board provided annual updates to the Plan participants regarding the Plan's assets held by the Trust. Notably, in December, 2015, despite earlier representations that the funding of the Plan with the State grant was sufficient to fully fund the Plan, the Corporation notified the Plan participants that the underfunding of the Plan had increased from approximately $14 million in 2013 to approximately $33 million by the end of 2014. The Board of Directors explained that this increase in the deficit was due to the Plan's [*5]actuaries taking a more conservative investment approach that resulted in lower investment returns. In October, 2016, the Plan participants were notified for the first time that "[t]he Plan's actuaries have estimated that the Plan will exhaust its assets sometime between 2024 and 2028. The Plan will not be able to pay benefits to participants after its assets have been exhausted".
Given the Plan's impending demise, the Corporation's Board of Directors passed a resolution in October, 2017, to opt in to the requirements of ERISA and reinstate PBGC coverage for the Plan. However, despite the passing of this resolution, ERISA or PBGC coverage was never elected or reinstated, leaving the remaining Plan assets unprotected and uninsured. Ultimately in October, 2018, the Board passed a resolution terminating the Plan, effective November 1, 2018. The Plan participants were notified that, effective February 1, 2019, those who had been receiving benefit payments since November 1, 2015, or had attained age 62 on or before that date but had not applied for their pensions, would receive a reduced benefit amounting to 70% of their vested pension. 440 pensioners, including 40 Hartshorne Plaintiffs, fall into this category. Participants who were not age 62 or older on November 1, 2015, were informed that they would receive no benefit regardless of the number of years they had worked for the Hospital. 661 pensioners, including 135 Hartshorne Plaintiffs, fall into this category.
Procedural History
In March, 2019, the Corporation's Board of Directors filed with this Court a Petition for Judicial Dissolution pursuant to the Not-For-Profit Corporation Law ("NPCL"). In that proceeding, which is still pending before this Court, the Corporation acknowledged that its liabilities exceed its assets, estimating that the Corporation is indebted to the Plan in the amount of $53.5 million. The Corporation seeks to absolve itself of all liability with respect to this debt even though it admits in the Petition that its "obligation to the Plan is just and valid, with respect to which the Corporation has no counterclaims or offsets". By Stipulated Order, dated January 12, 2023, the dissolution proceeding is being temporarily held in abeyance until a final determination is rendered in this consolidated action or until further Order of the Court.
In September, 2019, a group of 175 former employees of the Hospital commenced the Hartshorne action to recover their pension benefits and those of all 1,126 former employees of the Hospital. In their Second Amended Verified Complaint, the Hartshorne Plaintiffs allege causes of action sounding in breach of contract and breach of fiduciary duty against all Defendants. They allege that the Diocese controls the Corporation and in turn the Pension Plan and therefore is liable for the Corporation's breaches under the theory of alter ego and vicarious liability. They assert that the Diocese and the Corporation are jointly and severally liable for Plaintiffs' damages caused by their breaches. The Hartshorne Plaintiffs seek, inter alia, compensatory, expectation and punitive damages against all Defendants for the loss or reduction of their vested retirement benefits, an accounting and disgorgement of profits, restitution, and an award of attorneys' fees and costs.
In 2020, motions to dismiss were filed by Defendants to dismiss the Hartshorne action and the dissolution proceeding for failure to state a cause of action, among other defenses. By Decision and Order, dated May 8, 2020, this Court denied the motions filed in the dissolution proceeding. By Decision and Order, dated July 15, 2020, this Court denied the motions filed in the Hartshorne action, which was affirmed on appeal. See, Hartshorne v. Roman Catholic Diocese of Albany, 68 Misc 3d 849, aff'd, 200 AD3d 1427.
Thereafter, by Summons and Complaint, dated May 24, 2022, the Attorney General [*6]commenced a separate action against the Corporation, the Diocese, Bishop Hubbard, Bishop Scharfenberger, Very Reverend David LeFort, and Joseph Pofit (the "OAG action"). The Amended Verified Complaint in the OAG action alleges that the Diocese, through Bishop Hubbard and then Bishop Scharfenberger, controlled the Corporation and in turn, the Pension Plan. The causes of action sound in breach of fiduciary duty, the failure to properly administer charitable assets, and vicarious liability against the Diocese. The OAG demands Judgment against the Diocese and the individual Defendants and to pay full restitution to the Corporation for the waste and misuse of the Corporation's charitable assets and to pay damages plus interest at the statutory rate of 9% for the violation of their fiduciary duties.
By Order, dated November 18, 2022, the Hartshorne action and the OAG action were consolidated for all purposes, including trial. Following extensive discovery, a Note of Issue and Certificate of Readiness for Trial, with conditions as set forth in the Addendum thereto, was filed on February 28, 2023. After several failed mediations that were held in the context of this consolidated action and the bankruptcy proceeding filed by the Diocese, the within dispositive motions were filed.
Legal Standard of Review
"Summary judgment is a drastic remedy and should not be granted where there is any doubt as to the existence of a triable issue." Currier v. Wiltrom Assocs., 250 AD2d 956. See also, Andre v. Pomeroy, 35 NY2d 361; Phillips v. Kantor & Co., 31 NY2d 307. The proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence in admissible form to demonstrate the absence of any genuine material issues of fact. See, Alvarez v. Prospect Hosp., 68 NY2d 320; Winegrad v. New York Univ. Med. Center, 64 NY2d 851, 853. If the proponent makes such a prima facie showing, the burden shifts to the party opposing the motion to come forward and lay bare his evidentiary proof in admissible form sufficient to establish the existence of genuine material issues of fact which require a trial. See, Alvarez v. Prospect Hosp., supra, at 324; Zuckerman v. City of New York, 49 NY2d 557, 562. "Summary judgment is inappropriate in any case where there are material issues of fact in dispute or where more than one conclusion may be drawn from the established facts". Friends of Thayer Lake LLC v. Brown, 27 NY3d 1039, 1043, citing, Kriz v. Schum, 75 NY2d 25, 33-34.
On a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party. Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgt., LP, 7 NY3d 96, 105; Martin v. Briggs, 235 AD2d 192; McArdle v. M & M Farms, 90 AD2d 538. Pursuant to CPLR Rule 3212(b), "[i]f it shall appear that any party other than the moving party is entitled to a summary judgment, the court may grant such judgment without the necessity of a cross-motion".
The Diocese's Motion for Summary Judgment (Motion #13)
In this case of first impression, Plaintiffs seek to hold the Diocese legally responsible for the underfunding of the Hospital's Pension Plan based on the theory of alter ego liability, and vicariously liable for the alleged breaches of the individually named Defendants. In support of its Motion, the Diocese argues that the Corporation is not its alter ego, claiming that it merely sponsored the Hospital for religious purposes and therefore cannot be held liable for the Corporation's business decisions. The Diocese argues that there is no evidence establishing that it exercised complete domination and control over the Hospital sufficient to pierce the corporate veil and impose alter ego liability against the Diocese. Plaintiffs oppose the Motion.
The Diocese initially argues that the Court lacks subject matter jurisdiction over the claims asserted against the Diocese because to exercise such jurisdiction would delve into religious doctrine in violation of the Establishment Clause of the First Amendment of the United States Constitution. This argument lacks merit. The issues to be decided herein do not require the Court to rely on any religious precepts or determine any matter of religious faith and doctrine but rather, only pertain to purely secular matters that are governed by New York common law and statutory law. It is well settled that Courts have the jurisdiction and authority to apply principles of civil law and adjudicate claims relating to a religious organization's non-religious, secular actions. Bryce v. Episcopal Church in the Diocese of Colorado, 289 F.3d 648, 657; Jones v. Wolf, 443 U.S. 595, 602; Rweyemamu v. Cote, 520 F.3d 198, 208; Tr. of Diocese of Albany v. Trinity Episcopal Church of Gloversville, 250 AD2d 282, 285-286. For this reason, the expert opinion of Reverend Monsignor John A. Renken relied upon by the Diocese, which is solely based on canon law and not the secular laws of the State of New York, is irrelevant, immaterial and inapplicable here.
The Diocese also argues that Plaintiffs' claims must fail because as a non-profit corporation, it cannot use its assets to pay private individuals such as the pensioners. The Diocese contends that such payment would impermissibly constitute inurement and private benefit proscribed by 26 U.S.C. §501(c)(3) and IRC §170(c)(2)(C) and result in the loss of its tax-exempt status. This argument is also meritless. The doctrine prohibiting the direct inurement of charitable earnings to the benefit of private individuals pertains to the "insiders of the charity", such as the members or officers of a charitable organization. United Cancer Council v. Comm'r of Internal Revenue, 165 F.3d 1173, 1176. Therefore, the prohibition on private inurement does not apply to the claims of the Plaintiffs, who are non-insiders. Further, earned pension benefits are a type of deferred compensation which tax-exempt organizations are permitted to pay to its employees, even insiders, without losing its tax-exempt status. Bubbling Well Church of Universal Love, Inc. v. Comm'r of Internal Revenue, 670 F.2d 104.
Turning to the law on alter ego liability, it is well settled that in order for a parent corporation or sponsor to be liable for its subsidiary's legal breaches, a plaintiff must show "direct intervention by the parent in the management of the subsidiary to such an extent that the subsidiary's paraphernalia of incorporation, directors and officers are completely ignored." SUS, Inc. v. St. Paul Travelers Grp., 75 AD3d 740, 743. "[C]ourts will disregard the corporate form, or, to use accepted terminology, 'pierce the corporate veil', wherever necessary to prevent fraud or achieve equity". Cortlandt St. Recovery Corp. v. Bonderman, 31 NY3d 30, 47. "Under New York law, one corporation is considered to be a mere alter ego when it 'has been so dominated by . . . another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its.'" Trabucco v. Intesa Sanpaulo, S.p.A., 695 F. Supp. 2d 98. See also, Morris v. New York State Department of Taxation and Finance, 82 NY2d 135, 140-142.
"Generally, a plaintiff seeking to pierce the corporate veil must show that (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury". Cortlandt St. Recovery Corp. v. Bonderman, supra, at 47, quoting, Conason v. Megan Holding, LLC, 25 NY3d 1, 18. Courts determine whether to pierce the corporate veil on a case-by-case basis, considering such factors as whether corporate formalities are observed; whether corporate assets are used for personal rather than corporate purposes; whether there is [*7]an overlap in ownership, officers, directors and personnel; and whether the parent and the subsidiary share common office space, address and telephone number. Tap Holdings, LLC v. Orix Fin. Corp., 109 AD3d 167, 174; TNS Holdings v. MKI Sec. Corp., 92 NY2d 335, 339.
Based on the multitude of examples of the Diocese's domination and control over the Corporation as illustrated in the record before the Court, the Court finds that the Diocese has not made a prima facie showing of entitlement to dismissal of the claims asserted against it as a matter of law. While it is true that as a subsidiary of the Roman Catholic Church, the Hospital and its Catholic mission of providing health care services to the community was canonically overseen by the Diocese, the facts show that the Diocese oversaw much more than ensuring adherence to religious followings.
For instance, there is certainly an overlap in the membership of the Board as demonstrated by the Bishop's position on the Board as automatic director and Honorary Chair with the sole power to appoint, approve and/or remove every member of the Board whether they be clergymen or laymen. The Corporation's organizational chart shows a direct reporting line from the subordinate Board to the Diocese. Defendant Perry testified that the chart "accurately reflected the reporting structure" and that the Bishop was "his boss". Bishop Hubbard presided over Board meetings and from May, 2008 to August, 2009, he served as the sole director of the Corporation. After the Hospital closed, the Diocese and the Corporation shared a common address at 40 N. Main Avenue, Albany, New York, where their primary offices are physically located. Defendant Pofit, a Diocesan employee and President of the Board appointed by Bishop Hubbard, conducted the business of the Corporation from the pastoral center, utilizing Diocesan employees and resources for such business matters. He also held Board meetings in the pastoral center conference space. Defendant Pofit testified that he was a "conduit" of information between the Diocese and the Board. St. Clare's records were stored by the Diocese within its archives. All transfers of St. Clare's property had to be approved by the Diocese and/or the Vatican. Notably, when the Hospital closed and transferred its assets to Ellis Hospital, $41,000 was paid to the Vatican for permission to do so. The Corporation is listed in the Official Catholic Directory as associated with the Diocese.
In addition, there is ample evidence that suggests direct intervention by the Diocese in the management and administration of the Pension Plan. The Corporation, under the direction of Bishop Hubbard, represented to the IRS that it was controlled by the Diocese in obtaining church plan status. Once church plan status was granted, Bishop Hubbard signed an agreement with the PBGC for the return of premiums previously paid. From 1999 to 2006, in addition to being the Honorary Chair of the Board, Bishop Hubbard appointed himself as the Chair, presiding over Board meetings at which decisions regarding the management of the Pension Plan were made, such as whether to make minimal contributions to the Plan or none at all. Notably, the Board meeting minutes from February 25, 2008 state that "[t]he Diocese agreed to continue its sponsorship of the St. Clare's Hospital corporation, thereby continuing the Diocese's role in the leadership and pension administration". From 2016 to 2018, Bishop Scharfenberger, or Father LeFort in his stead, actively participated in all Board meetings and were both directly involved in the Board's consideration of whether to opt in to the requirements of ERISA and obtain PBGC insurance or terminate the Plan. The Board decided in favor of obtaining PBGC insurance coverage but that decision was later rescinded out of loyalty to the Diocese and at the direction of Bishop Scharfenberger, who expressed a moral obligation not to relinquish the church plan status and opt back in to PBGC insurance when the Plan was already severely underfunded.
All the above evidence, when viewed in the light most favorable to Plaintiffs, raises material issues of fact as to whether the Diocese exercised complete domination and control over the Corporation sufficient to establish that the Corporation is the alter ego of the Diocese, and that such domination and control caused a breach of fiduciary duty resulting in injury to the pensioners. The evidence suggests that the Corporation, under the direction of Bishop Hubbard and later Bishop Scharfenberger, continued to maintain the church plan status of the Plan, exempting it from future contributions and the requirement to maintain PBGC insurance coverage, all to the benefit of the Diocese and to the detriment of the pensioners. The evidence further suggests that the Corporation, under the direction of Bishop Hubbard and later Bishop Scharfenberger, continued to administer the Plan at an increasing deficit to avoid the public relations embarrassment it would suffer if the Plan was terminated. There is further evidence that the Corporation, under the direction of Bishop Hubbard, knew that the $28.5 million State grant was insufficient to fully fund the Plan yet accepted this amount and represented to the pensioners that the infusion of this grant would fully fund the Plan.
Bishop Scharfenberger states in his Affidavit in support of the Diocese's Motion that the Hospital "was not a diocesan controlled business or entity" and that the Diocese "was never involved in the establishment, operation, administration, maintenance, investing, reporting, funding, supervision or control of any aspect of the . . . Pension Plan". He represents that at no time during his voluntary service as Honorary Chair of the Board did he have the authority to make any decisions or exercise any control over the day-to-day operations of the Corporation or the Pension Plan itself. He states that his role was limited to the canonical oversight of the Corporation to ensure that it remained compliant with the principles and teachings of the Roman Catholic Church. These self-serving, conclusory statements belie the discovered facts and are insufficient to satisfy the Diocese's prima facie burden on its Motion. 
The expert opinion of G. Daniel Miller, Esq. is likewise insufficient. Mr. Miller opines that an organization's pension plan need not be controlled by a church to qualify for church plan status but rather, need only be associated with a church, as is the case here. Whether this statement is true or not, the salient fact remains that the Corporation represented to the IRS, upon which representation the IRS relied in granting church plan status, that the Pension Plan was established, maintained and controlled by the Roman Catholic Church. Further, Mr. Miller concludes that "based on the facts known to me, the Diocese was not at any time directly involved in the day-to-day operations of the Hospital" and therefore "would not be jointly and severally liable for the pension plan's unfunded benefit liabilities under the applicable PBGC regulations". Again, this conclusion belies the facts described above. Moreover, his belief that even if PBGC coverage was in place and premiums had been paid, such coverage may not be available for participants in a terminated, underfunded plan, is not supported by any proof and is entirely speculative.
Further, the Diocese's reliance on Johnson v. Evangelical Lutheran Church in America, 2011 U.S. Dist. LEXIS 80549, is unpersuasive given the procedural and factual differences between that case and the case at bar. The plaintiffs in Johnson asserted claims of breach of fiduciary duty and breach of contract against a church and its alleged alter ego, the pension board, for causing a reduction in their pension benefits. In granting a motion to dismiss, with leave to amend, the U.S. District Court for the District of Minnesota, applying Minnesota law, found that plaintiffs, who merely alleged that the church and the pension board shared a close relationship, had not sufficiently pleaded their claim that the corporate form between the church [*8]and the pension board had been disregarded. Here, New York law applies and this case is no longer at the pre-answer, motion to dismiss stage but rather, is at the post-pleading, post-discovery, summary judgment stage. Further, the evidence in this case suggests that the Diocese had much more than a mere close relationship with the Corporation and that it not only exercised ecclesiastical oversight of the Hospital's adherence to Catholic teachings and doctrines, but was directly involved in and even controlled the business decisions with respect to the Pension Plan.
With respect to the breach of contract claim against the Diocese as asserted in the Hartshorne action, the Diocese argues that this claim should be dismissed because of a lack of privity of contract between the Diocese and Plaintiffs. The Diocese cites to the fact that the Plan documents make no mention of the Diocese. However, this argument ignores Plaintiffs' alter ego theory of liability which does not require privity of contract between the parent/sponsor and the injured party when the parent/sponsor caused the breach or directed the subsidiary to breach the contract. See, Town-Line Car Wash, Inc. v. Don's Kleen Mach. Kar Wash, Inc., 169 AD3d 1084; Ventresca Realty Corp., 41 AD3d 707. The factual disputes identified above support the denial of summary judgment to the Diocese on the breach of contract claim.
Similarly, issues of fact remain as to whether the Diocese should be held vicariously liable for the breaches of fiduciary duty by Defendant Hubbard, Defendant Scharfenberger and Defendant Pofit. The evidence suggests that these individuals all held fiduciary roles at the behest of the Diocese, were acting within the scope of their Diocesan duties as Board members, and were acting in furtherance of the Diocese's interests rather than the Plan participants' interests. 
Lastly, since Plaintiffs have represented that they are not asserting a separate cause of action against the Diocese under any provisions of the Labor Law, the Diocese's arguments with respect to any Labor Law claims will be disregarded.
Based on the foregoing, the Court finds that the Diocese has not met its prima facie burden of demonstrating the absence of any genuine material issues of fact that would enable the Court to find that as a matter of law, there is no evidence to support Plaintiffs' claims that the Corporation is the alter ego of the Diocese who exercised complete domination and control over the management and administration of the Pension Plan. The vast record developed herein, replete with disputed facts, demonstrates that "this fact-laden claim to pierce the corporate veil is particularly unsuited for resolution on summary judgment". F. Ins. Co. v. Texarkoma Transp. Co., 229 AD2d 341, 342. See also, Goodspeed v. Hudson Sharp Mach. Co., 105 AD3d 1204, 1205-1206. Accordingly, the Diocese's Motion for Summary Judgment is hereby denied in its entirety.
Defendant Hubbard's Motion for Summary Judgment (Motion #14)
In support of his Motion, Defendant Hubbard argues that 1) the OAG action is barred by the applicable statute of limitations; 2) the first and second causes of action asserted by the OAG pursuant to NPCL §112-a, §717 and §720, and EPTL §8-1.4(m) must be dismissed on the grounds that such provisions are inapplicable to the facts of this case; and 3) the third cause of action for breach of fiduciary duty in both the OAG action and the Hartshorne action must be dismissed because Bishop Hubbard did not dominate or control the Corporation and did not owe a fiduciary duty to the Plan participants and their beneficiaries since he was not named a trustee of the Plan. Defendant Hubbard argues that there is no proof that Bishop Hubbard was directly involved in the hands-on fiduciary management of the Pension Plan funds, rendering it impossible for him to provide an accounting of his actions. Further, Defendant Hubbard argues [*9]that the breach of contract claims must be dismissed as duplicative of the breach of fiduciary duty claims and because they are unsupported by the facts and law.
The OAG action is not time-barred. Pursuant to CPLR §213(7), "an action by or on behalf of a corporation against a present or former director, officer or stockholder for an accounting, . . . or to enforce a liability, . . . or to recover damages for waste or for an injury to property or for an accounting in conjunction therewith", "must be commenced within six years". The OAG action falls squarely under CPLR §213(7). See, Spitzer v. Schussel, 7 Misc 3d 171, 175 ("an action by the Attorney General under the NPCL is one 'on behalf of' a corporation and thus falls within the ambit of CPLR §213(7)"); People v. Austin, 2021 NY Misc. LEXIS 401 (six-year statute of limitations applies to Attorney General's claims under the NPCL and the EPTL).
Further, since the OAG's statutory and breach of fiduciary duty claims do not only seek monetary damages but also seek equitable relief in the form of an accounting and restitution, a six-year statute of limitations applies pursuant to CPLR §213(1) ("an action for which no limitation is specifically prescribed by law must be commenced within six years"). See, Loengard v. Santa Fe Indus., 70 NY2d 262, 266-267 (equitable claims based on the breach of fiduciary duty are governed by the six-year statute of limitations pursuant to CPLR §213(1)); Spitzer v. Schussel, supra, at 174 ("[t]he money damages are merely meant to make the nonprofit organization whole, and thus are akin to an equitable remedy" to which "the longer six-year statute of limitations should apply").
As previously held by this Court, and affirmed by the Appellate Division, the claims brought by the Hartshorne Plaintiffs accrued on "February 1, 2019, the date on which the Defendants first failed to pay the Plaintiffs their accrued pension benefits". Hartshorne v. Roman Catholic Diocese of Albany, supra, at 861. The related claims brought by the OAG similarly accrued on February 1, 2019. Since the OAG commenced its action on May 24, 2022, well within six (6) years of the date that the claims accrued, the OAG action was timely commenced. 
Defendant Hubbard's arguments that the OAG's statutory claims do not apply to pension plan entities and that the facts herein do not support the relief sought are misplaced. The Attorney General has standing to sue in the public's interest as well as assert claims under EPTL §8-1.4, and has the authority to seek monetary damages under NPCL §720(a). See, Ederer v. Gursky, 9 NY3d 514, 525; People ex rel. Cuomo v. Lawrence, 74 AD3d 1705, 1707; Schneiderman v. Lower Esopus River Watch, Inc., 39 Misc 3d 1241(A). The Attorney General's purpose in bringing its separate action is to protect the state's interest to ensure that charitable corporations, like St. Clare's, and their assets, are properly administered and managed for their beneficiaries. The Attorney General's statutory oversight applies to all corporate assets of a not-for-profit corporation, not just those assets that are deemed charitable. See, NPCL §720(a); EPTL §8-1.4(a)(1) and (2). The Attorney General's jurisdiction extends to ensure that the officers, directors and trustees of a not-for-profit corporation fulfill their fiduciary duties to the beneficiaries of the corporation. See, EPTL §8-1.4(m). There is no legal authority for Defendant Hubbard's position that the above-cited statutes do not apply to pension plans administered by a nonprofit corporation such as St. Clare's, or that pension plans are somehow exempt or insulated from the prosecutorial authority that the Attorney General derives from these statutory provisions.
With respect to Defendant Hubbard's argument that the breach of fiduciary duty claims [*10]must be dismissed against Bishop Hubbard, the movant relies in part on Attorney Raymond McCabe's deposition testimony that Bishop Hubbard was not a part of the functioning Board of Directors of the Corporation and was purposefully and expressly excluded from being named a trustee of the Pension Plan. Attorney McCabe testified that Bishop Hubbard was expressly excluded by Board members from any involvement with the appointment of the trustees and was locked out of any other duties beyond his position as Honorary Chair as of 2007.
Defendant Hubbard also relies on the expert opinion of Jeffery E. Schaff, AIFA, that the failure to fund the Pension Plan was not a fiduciary breach and that the Hospital delegated its duties prudently to large, credible professional service providers, Prudential and the Plan's auditor, KPMG, and reasonably relied on their advice and judgment as well as that of the Hospital Board's Finance Committee. Mr. Schaff states that "there was no regulatory duty that required [the Board] to make contributions [to the Plan]" (see, paragraph "61" of Mr. Schaff's Expert Affidavit, sworn to on April 29, 2024). He bases this opinion in part on the deposition testimony of Attorney McCabe, who testified that contributions are the settlor's duty, not the fiduciary's duty, and therefore, the failure to make contributions cannot constitute a breach by the fiduciary because the fiduciary does not owe a duty to make contributions. 
Mr. Schaff states that the Hospital simply could not afford to make contributions to the Plan. Further, the guaranteed annuity contract did not allow for moving assets from the fixed account to a variable account in order to invest in stocks and thereby increase growth. Mr. Schaff opines that the insolvency of the Pension Plan was caused by an excess of lump sum withdrawals by participants, the stock market crash of 2008, the sub-par performance of Plan assets while Prudential was managing the Plan, and the underfunding of the Plan by the State of New York, and was in no way caused by any wrongdoing on the part of Bishop Hubbard.
Mr. Schaff further opines that Bishop Hubbard's denial of the request to merge the Pension Plan with the Diocese's pension plan was not a fiduciary breach because there is nothing in the record to establish that he had the authority to do so and even if he did have such authority, the underfunding of the Pension Plan would have caused him to breach his fiduciary duty to the Diocese's plan participants.
Similar to the Court's findings with respect to Mr. Miller's expert opinion offered on behalf of the Diocese, Mr. Schaff's expert opinion and Attorney McCabe's deposition testimony also belie the facts described above. There is ample evidence in the record to raise questions of fact as to whether Bishop Hubbard controlled the Corporation and was directly involved in the hands-on fiduciary management of the Pension Plan funds. As stated above, Bishop Hubbard was the Honorary Chair of the Board from 1977 to 2014. He was directly involved in applying to the IRS for church plan status and in negotiating the return of insurance premiums from the PBGC. He was the self-appointed Chairman of the Board from 1999 to 2006, and from May, 2008 to August, 2009, he served as the sole director of the Corporation with the sole responsibility for all decisions relating to the Plan. He presided over Board meetings at which decisions relating to the Plan were made, such as the decision to not make any further contributions to the Plan, to not opt in to PBGC coverage, to only seek $28.5 million from the State, and other investment decisions. Defendant Pofit reported to Bishop Hubbard and was the "conduit" of information between Bishop Hubbard and the Corporation. Defendant Pofit testified that no one ever challenged the Bishop and his decisions with respect to the Corporation, stating, "no one says no to the Bishop".
The elements of a breach of fiduciary duty claim are: (1) a special relationship of trust [*11]that was established between the parties for the benefit of the plaintiffs; (2) the defendants' breach of their duty ensured by that trust; and (3) injury sustained by the plaintiffs as a result of the defendants' breach. Northeast Gen. Corp. v. Wellington Adv., 82 NY2d 158, 160-62. The fact that Bishop Hubbard was not a named trustee of the Pension Plan Trust is not dispositive of the question as to whether he was actually involved in and/or had discretionary authority and control with respect to the management and administration of the Trust. There is sufficient evidence to raise material issues of fact as to whether Bishop Hubbard owed a fiduciary duty to the Corporation and to the Plan participants and their beneficiaries, and whether he breached his fiduciary duties of care, loyalty and obedience to law and governing corporate policies. See, Matter of Frankel, 123 AD3d 826.
There are also issues of fact as to whether Bishop Hubbard acted in good faith and reasonably relied on the advice of professionals. Whether Bishop Hubbard relied in good faith on the financial reports he was receiving from the Board of Directors of the Corporation, as well as third parties, regarding the solvency or lack thereof of the Pension Plan, entitling him to dismissal of the claims against him under the common law Business Judgment Rule, is a question of fact for the jury. See, People of the State of New York v. the Lutheran Care Network, Inc., 167 AD3d 1281.
In addition, the OAG action and the Hartshorne action do not seek a double recovery as argued by Bishop Hubbard. The OAG action is based on statutory claims while the Hartshorne action is based on causes of action sounding in breach of fiduciary duty and breach of contract. Although these causes of action are based on the same underlying conduct, each one sets forth a separate and independent legal theory of recovery. "[T]he Court of Appeals has identified 'borderland situations' where '[a] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship'". Reade v. SL Green Operating Partnership, LP, 30 AD3d 189, 190, quoting, Sommer v. Federal Signal Corp., 79 NY2d 540, 551. See also, New York Univ. v. Continental Ins. Co., 87 NY2d 308, 316-317.
Plaintiffs' breach of contract claim is founded upon the employment contract itself and the promises contained therein. Their breach of fiduciary duty claim is based on equitable principles under the common law. The OAG claims are based in statute. Furthermore, the causes of action do not seek the same identical damages. Each cause of action seeks a different remedy. The breach of contract cause of action seeks monetary damages in the form of compensation for lost individual benefits, while the breach of fiduciary duty cause of action seeks equitable damages to make the Corporation whole in order to adequately fund the Trust. The OAG action seeks to hold Defendants accountable for the debt owed to all Plan participants. These respective remedies can of course, be offset to avoid a double recovery. Thus, the Court finds that the claims of the OAG and the Hartshorne Plaintiffs are not duplicative of each other.
Based on the foregoing, the Court finds that Defendant Hubbard has not met his prima facie burden of demonstrating the absence of any genuine material issues of fact entitling him to judgment as a matter of law. Accordingly, Defendant Hubbard's Motion for Summary Judgment is hereby denied in its entirety.
Defendants Scharfenberger and LeFort's Motion for Summary Judgment (Motion #15)
In support of their Motion, Defendants Scharfenberger and LeFort essentially argue the same bases for dismissal of the claims asserted against them as Defendant Hubbard argued in support of his Motion. For the sake of brevity, the Court's findings set forth above are hereby [*12]incorporated herein with respect to this Motion. Specifically, the OAG action is not time-barred for the reasons set forth above, and the Attorney General has the authority to bring claims under EPTL §8-1.4 and seek monetary damages under NPCL §720(a). 
There is also sufficient evidence to raise questions of fact as to whether Bishop Scharfenberger and his Vicar General, Father LeFort, were directly involved in the administration and hands-on fiduciary management of the Pension Plan funds. After Bishop Hubbard's retirement, Bishop Scharfenberger served as an automatic Board member and Honorary Chair of the Corporation's Board from 2014 to the present. However, from 2014 until sometime in 2016, Bishop Scharfenberger did not attend a single Board meeting. Bishop Scharfenberger testified that he would send his Vicar General, Father LeFort, to attend the Board meetings and vote in his stead, even though such proxy is not allowed under the Corporation's By-Laws. Then from 2016 through 2018, when the Board was considering whether to opt in to the ERISA regulations and obtain PBGC insurance coverage, Bishop Scharfenberger personally, and his Vicar General, Father LeFort, were directly involved and actively participated in every Board meeting that was convened for the sole purpose of discussing the Pension Plan. While the Board decided to opt in to the ERISA requirements, that resolution was later rescinded out of loyalty to the Diocese rather than out of loyalty to the Plan participants. Bishop Scharfenberger objected to the resolution, expressing a moral obligation to the Diocese not to relinquish the church plan status and opt back in to PBGC insurance when there already was an enormous deficit, later testifying at his Examination Before Trial that to do so would have looked bad for the Diocese and have been "a public relations nightmare". Bishop Scharfenberger and Father LeFort also attended meetings with Defendant Pofit and Attorney McCabe to discuss the underfunding of the Plan and the decision to terminate the Plan.
Thus, material issues of fact exist as to whether Bishop Scharfenberger and Father LeFort owed a fiduciary duty to the Corporation and to the Plan participants and their beneficiaries, and whether they breached their fiduciary duties of care, loyalty and obedience to law and governing corporate policies. There are also issues of fact as to whether Bishop Scharfenberger and Father LeFort acted in good faith and reasonably relied on the advice of professionals. Defendants Scharfenberger and LeFort have not met their prima facie burden of demonstrating the absence of any genuine questions of fact entitling them to judgment as a matter of law. Accordingly, their Motion for Summary Judgment is hereby denied in its entirety.
The Hartshorne Plaintiffs' Motion for Partial Summary Judgment against
Defendant, St. Clare's Corporation (Motion #16)
The Hartshorne Plaintiffs move for partial summary judgment against the Corporation on their breach of contract cause of action. They seek damages in the amount of $73.7 million plus statutory prejudgment interest of 9% from February 1, 2019 through the date of the Judgment. The Corporation opposes the Motion.
In support of their breach of contract claim, the Hartshorne Plaintiffs allege that the Corporation, and the Diocese who controls the Corporation, breached the terms of the Plaintiffs' employment contract that promised them defined pension benefits upon their retirement. Plaintiffs rely on the Plan documents, defined above as the 2000 Amended and Restated Plan and the 2005 SPD, to evidence the Corporation's express agreement that it would fully fund the Plan and pay the promised benefits to all Plan participants and further, that it would not amend or modify the Plan in any way that would reduce or terminate any benefits that had accrued prior [*13]to such amendment. The Hartshorne Plaintiffs assert that the Corporation knowingly breached this agreement by failing to fund the Plan; by amending the Plan which in fact reduced or eliminated the payment of accrued pension benefits; and by terminating the Plan without providing all accrued plan benefits to them as promised.
In opposition, the Corporation argues that it did not breach the terms of the Plan documents because such terms permitted the Corporation to unilaterally terminate the Plan at any time and did not obligate the Corporation to fund the Plan at any particular level. The Corporation contends that it did not have a contractual obligation to fully fund the Plan and that it had sole discretion to decide when and in what amount contributions to the Plan should be made. 
The Hartshorne Plaintiffs further allege that the Corporation breached the contract by failing to adhere to ERISA's funding standards and/or failing to guarantee benefits up to the PBGC's limit, all in violation of the express terms of the Plan. While the Corporation is correct in pointing out that the Plan is exempt from ERISA as a "church plan" and therefore excused from any particular funding requirements, the Hartshorne Plaintiffs also correctly point out that the Plan assets were initially insured and that the Plan documents contain promises that the pension rights accrued thereunder are guaranteed in accordance with ERISA and up to the amount covered by the PBGC. Indeed, the Plan documents specifically refer to the ERISA standards and incorporate the rights and protections provided under ERISA. Therefore, the church plan exemption from federal requirements under ERISA had no effect on the Corporation's independent obligations to the Plan participants under New York law.
New York law is clear that pensions are not a gratuity but are "wage supplements". See, Labor Law §198-c. Summaries of employee benefit plans such as the 2005 SPD have been held to be expressions of employment contract obligations. See, Matter of Consol. Mut. Ins. Co., 77 NY2d 144, 148-149. Participants in a pension plan may enforce their right to promised retirement benefits under a breach of contract claim if they can demonstrate "(1) formation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage." Clearmont Prop., LLC v. Eisner, 58 AD3d 1052, 1055. See, generally, Agway, Inc. v. Curtin, 161 AD2d 1040, 1041. See also, Scoville v. Surface Transit, Inc., 39 Misc 2d 991 (the pension plan, by which the employer promised to pay the plaintiffs certain pension benefits upon their retirement, "vested in each [plaintiff] an indefeasible right to the promised benefits" upon their completion of service); Cantor v. Berkshire Life Ins. Co., 171 Ohio St. 405. Although not binding on this Court, the Opinion by the Supreme Court of Ohio in Cantor is instructive, and reads in pertinent part as follows:
. . . [A]n employer cannot offer a retirement system as an inducement to employment and, after an employee has accepted employment under such circumstances, withdraw or terminate the program after an employee has complied with all the conditions entitling him to retirement rights thereunder.
Therefore, whether a retirement plan is contributory or noncontributory and even though the employer has reserved the right to amend or terminate the plan, once an employee, who has accepted employment under such plan, has complied with all the conditions entitling him to participate in such plan, his rights become vested and the employer cannot divest the employee of his rights thereunder.
Plaintiff having complied with all the conditions in his contract entitling him to [*14]retirement rights and having reached retirement age under the contract, his retirement rights became vested and Berkshire could not terminate his contract so as to divest him of such rights.
Id., at 410.
There is no dispute that a binding employment contract exists between the pensioners and the Corporation which promised wages and future pension benefits in exchange for work performed. All the pensioners worked for the Corporation for at least five (5) years which, pursuant to the contract's unambiguous terms, entitled them to the accrual of fully vested pension benefits. There is also no dispute that the Corporation breached its contractual duty by failing to pay the full benefits promised to the pensioners. The reduction or cessation of benefits, which became effective February 1, 2019, was contrary to and in direct breach of the terms of the 2000 Amended and Restated Plan and the 2005 SPD that provided that no amendment or termination of the Plan would reduce any vested benefits that had accrued under the Plan. There can be no dispute that the pensioners sustained monetary damages as a direct result of the Corporation's breach. Indeed, the Corporation admitted in its Petition for Judicial Dissolution that it owes $53.5 million to the Plan with no counterclaims or offsets. Based on these undisputed facts, the Court finds that as a matter of law, the Hartshorne Plaintiffs are entitled to summary judgment on their breach of contract cause of action against the Corporation.
The Hartshorne Plaintiffs submit the Expert Report of Robert H. Danesh, FSA, EA, MAAA, dated November 15, 2022, as supplemented by his Affidavit, sworn to on June 12, 2024, in support of their request for a money judgment in the amount of the damages suffered by the pensioners due to the Corporation's breach of contract. Mr. Danesh performed two sets of liability estimates, to wit: one estimate calculated the total amount needed to fully fund the Plan's obligations to all pensioners, and a second estimate calculated the amount of liability to each of the Hartshorne Plaintiffs. In performing his calculations, Mr. Danesh used a Benefits Spreadsheet that had been provided by the Corporation during discovery. This spreadsheet contained the demographic information for all 1,126 Plan participants and their vested accrued benefits. The participants were grouped into three categories as set forth in the Plan documents for allocating Plan assets upon termination. These categories, which are consistent with PBGC standards, are: 1) Group B1 — Participants receiving a vested accrued benefit as of the beginning of the three-year period ending on the termination date of the Plan (further subdivided into participants who elected to receive their pension benefits as a lump-sum payment and those who elected to receive their pensions in the form of an annuity); 2) Group B2 — Participants eligible for but not in receipt of a vested accrued benefit as of the beginning of the three-year period ending on the termination date; and 3) Group C — All other participants with a vested accrued benefit. 440 pensioners, including 40 Hartshorne Plaintiffs, are in Groups B1 and B2. 661 pensioners, including 135 Hartshorne Plaintiffs, are in Group C.
Mr. Danesh calculated the present value of the Pension Plan's total liability to all participants, and the Plan's liability to only the Hartshorne Plaintiffs, by selecting interest rates and a mortality table consistent with IRC 417(e)(3). While the mortality table specified in the Plan documents is the same as that prescribed by IRC 417(e)(3), the Plan documents use a different interest rate. The Plan documents use an "annual rate of interest on 30-year Treasury securities for the second calendar month preceding the Plan Year in which the distribution is made". Thus, Mr. Danesh performed two different calculations using the two different rates of [*15]interest.
Pursuant to these calculations, as fully detailed in his Report, Mr. Danesh concluded that the present value of the unpaid vested accrued benefits for all Plan participants, as of the date of his Report, using the current interest rates as prescribed by the IRS, was $66.8 million. Utilizing the interest rate identified in the Plan documents, the present value of the unpaid vested accrued benefits for all Plan participants, as of the date of his Report, was $73.7 million. Although Mr. Danesh did calculate the present value of the unpaid vested accrued benefits for each of the Hartshorne Plaintiffs using the two different interest rates, as reflected in Exhibits 4 and 6 attached to his Report, he did not provide the total amount of liability to only the Hartshorne Plaintiffs under either calculation.
In opposition to Mr. Danesh's calculations, the Corporation argues that his calculation of the present value of the Plan's liability, as of the date of his Report, uses an arbitrary and random date. Rather, the Corporation submits that a proper calculation of Plaintiffs' damages is the present value of their benefits as of February 1, 2019, the date that payments ceased or were reduced, with interest accruing from that date at the statutory rate of 9% per year. The Corporation also argues that it would be improper for the Court to award damages to any Plan participants who are not Plaintiffs in this litigation.
In response to these arguments, Mr. Danesh supplemented his Report and recalculated the present value of the unpaid vested accrued benefits for all Plan participants, and for the Hartshorne Plaintiffs only, utilizing the mortality table and the applicable interest rate of 3.36% identified in the Plan documents from February 1, 2019. Mr. Danesh concluded that the total Plan liability for all participants is $54.2 million. Adding 9% annual interest and any missed payments from February 1, 2019 to April 1, 2024, the total Plan liability for all participants is $93.6 million. Mr. Danesh also recalculated the present value of the unpaid vested accrued benefits for each of the Hartshorne Plaintiffs by using the 3.36% interest rate from February 1, 2019, as reflected in Exhibit B attached to his Supplemental Affidavit. However, he did not provide the total amount of liability to only the Hartshorne Plaintiffs under this calculation.
The Court finds that Mr. Danesh's calculations are reliable and in accordance with generally accepted actuarial standards. Based on the foregoing, the Court hereby grants the Hartshorne Plaintiffs' Motion for Partial Summary Judgment against St. Clare's Corporation, and awards Judgment to the Hartshorne Plaintiffs only, in the amount of the present value of their individual vested accrued benefits using the mortality table and the 3.36% interest rate identified in the Plan documents, from February 1, 2019.[FN4]
The Hartshorne Plaintiffs are also awarded 9% statutory interest from February 1, 2019 to the date of the Judgment. The Hartshorne Plaintiffs are hereby directed to submit a proposed Judgment consistent with the amounts set forth in Exhibit B attached to Mr. Danesh's Supplemental Affidavit.
Defendants Perry and Pofit's Motion for Partial Summary Judgment (Motion #17)
In support of their Motion to dismiss the breach of fiduciary duty claims asserted against them in the Hartshorne action, Defendants Perry and Pofit argue that they are entitled to [*16]statutory immunity from any liability pursuant to NPCL §717(b). In addition, Defendant Pofit argues that as an uncompensated director of the Board, he is further immune from personal liability pursuant to the protections afforded to uncompensated officers and directors under NPCL §720-a. The Hartshorne Plaintiffs oppose the Motion.
NPCL §717(b), which is a codification of the common law Business Judgment Rule, provides immunity to officers and directors of a corporation who reasonably rely in good faith upon competent employees and outside professionals in taking any actions and/or rendering decisions in furtherance of corporate matters. See, Matter of Kenneth Cole Prods., Inc., Shareholder Litig., 27 NY3d 268, 274-275; People v. Grasso, 11 NY3d 64, 70 (officers and directors of nonprofit corporations are protected under NPCL §717(b) as long as they can demonstrate that they acted in good faith upon information of reasonable reliability).
Defendant Perry served as the President and Chief Executive Officer of the Corporation from July, 2005 to June, 2008 when the Hospital closed. He received approximately $1 million in severance pay when the Hospital closed. He testified at his Examination Before Trial that the day-to-day operations of the Pension Plan were managed by the Corporation's board of directors, officers, employees and delegates, including Bishop Hubbard who had appointed him, and other Diocesan employees.
Defendant Pofit, an employee of the Diocese, was appointed to the Board by Bishop Hubbard in September, 2006. After the Hospital closed in 2008, Bishop Hubbard appointed Defendant Pofit as the Chairman of the Board and President of the Corporation. Defendant Pofit acted as a "conduit" or agent for Bishop Hubbard and conveyed information between the Board and Bishop Hubbard. Defendant Pofit continues to serve as Chairman and President to the present time and has received approximately $1 million compensation for his services.
Defendants Perry and Pofit contend that during their respective tenures as officers, they acted in good faith and reasonably relied upon the Corporation's actuaries, Prudential and Milliman, the Corporation's legal counsel, Attorney McCabe, and the Corporation's Vice President of Finance, Edward Gasparovic, in deciding whether to make contributions to the Plan and if so, in what amounts; in deciding whether to amend the Plan documents; in deciding how to invest the Plan assets; and in deciding if and when to terminate the Plan. They further allege that they did not receive any personal benefit as a result of their positions on the Board.
However, the facts show that the Corporation stopped making any employer contributions to the Plan or made only nominal contributions, contrary to the recommendations of the Corporation's actuaries. There is proof that the actuaries recommended contributions through 2017 totaling over $46 million, while the Corporation only contributed $12 million to the Plan, contributing nothing for 12 out of the 15 years beginning in 2002. The actuaries advised the Board to terminate the Plan as early as 2002 but the Board failed to follow this advice and continued to administer the Plan at an increasing deficit until it ultimately decided in 2018 to terminate the Plan.
Prudential attended a Corporate Board meeting every year from 2009 through 2017, and at each of those meetings, Prudential informed the Board that the Plan was underfunded and would not be able to pay all earned benefits. Indeed, Attorney McCabe testified that it was as early as 2009 when he realized that the Plan was "doomed to fail." Nonetheless, in all communications from Defendant Pofit to Plan participants from 2009 through 2015, he omitted the critical information that Plan assets would be exhausted before all benefits could be paid. Even in 2016, Defendant Pofit advised Plan participants that their benefits would run out [*17]sometime between 2024 and 2028, despite the fact that the Board was actively considering termination of the Plan at the time this communication was sent.
In 2017, as the Plan's assets continued to diminish, Prudential recommended to the Board to elect PBGC coverage which would provide 40% benefit replacement for all participants in the event of Plan termination. Prudential advised that if the Plan terminated as a non-electing church plan, the Plan's assets would cover only 30% of the Plan's total benefits. Therefore, electing PBGC coverage would result in a net gain to the Plan participants by 2019.
Similarly, Attorney McCabe advised the Board in 2017 regarding the election of PBGC coverage. He advised the Board that if it were to relinquish church plan status and pay PBGC insurance premiums for one year, Plan participants who otherwise would receive no benefit in a plan termination would receive 20% of their promised benefit (with an estimated value of $10.6 million). He further advised that if St. Clare's paid PBGC premiums for two years, these same participants would receive 40% of their benefits (with an estimated value of $21.2 million).
Initially, the Board heeded the advice of Prudential and Attorney McCabe, and voted unanimously to opt in to the ERISA requirements and purchase PBGC coverage for the Pension Plan. However, in 2018, the Board learned that its Directors' and Officers' Liability insurance coverage would not be extended, meaning they would no longer be insured in connection with their actions, or inactions, on behalf of the Corporation. In addition, Bishop Scharfenberger informed the Board that he had a "moral" opposition to relinquishing church plan status and seeking money for the Plan from the PBGC, into which the Corporation had not been paying premiums. As a direct result of these events, and against the advice of its financial advisors and counsel, the Board reversed its prior vote, elected not to purchase PBGC coverage, and terminated the Plan soon thereafter. Although Defendant Pofit wrote in a 2018 memorandum that the Corporation's Board could resign en masse, leaving the Bishop and the Diocese with sole responsibility for the Plan, he testified that the Board chose not to take this step out of a sense of loyalty to Bishop Scharfenberger.
All the above suggests that as the fiduciaries of the Plan's assets, Defendants Perry and Pofit owed the Plan participants a duty of loyalty, fidelity and prudence in managing and protecting the Plan's assets. They also owed a duty to disclose accurate and truthful information regarding the investment and underfunding of the Plan. Issues of fact remain as to whether Defendants Perry and Pofit breached their fiduciary obligations to the Plan participants by failing to ensure that the Plan had sufficient assets that were adequately preserved, prudently managed and invested in accordance with the Plan's terms and objectives so that the necessary funds would be available to pay the vested benefits promised to them. There are factual disputes regarding whether Defendants Perry and Pofit failed to adequately insure the Plan and reinstate PBGC insurance coverage when it was clear that remedial actions were necessary to rectify their past mismanagement of the Plan. Questions remain regarding whether Defendants Perry and Pofit provided misleading and inaccurate information to the Plan participants regarding the underfunding of the Plan, in violation of their fiduciary duties owed to the Plan participants. See, Matter of McNeil, 233 AD3d 1231.
Whether Defendants Perry and Pofit acted in good faith with respect to the administration and management of the Pension Plan remains a question of fact precluding summary judgment. Further, based on the facts described above, there is some evidence suggesting that they did not always follow the advice of Prudential, Milliman, or Attorney McCabe. When they did follow the advice of these professionals, questions remain as to whether it was reasonable to rely on this [*18]advice. Given these triable issues of fact, the Court cannot find that, as a matter of law, Defendants Perry and Pofit are entitled to qualified immunity under NPCL §717(b) or the common law Business Judgment Rule. See, People v. Grasso, supra. 
With respect to Defendant Pofit's claim of immunity under NPCL §720-a, the Court finds that this statute does not offer him a defense because there is proof that Defendant Pofit was compensated in relation to his Board position. Defendant Pofit admits that he was compensated for certain administrative tasks he performed for the Corporation but states that these tasks were separate and apart from his position on the Board. This vague, self-serving statement is specious and wholly insufficient to enable the Court to make a finding that the administrative services he provided for the Corporation were not at all related to his duties as a Board member. 
In addition, there is evidence suggesting that in 2010, the Diocese, under the leadership of Bishop Hubbard, directed the Corporation to enter into a "Services Contract" with Catholic Charities, whereby Defendant Pofit, through his sole member company, DCHA, was paid by the Corporation to provide day-to-day administrative support. This services contract suggests an inherent conflict of interest created by Bishop Hubbard, and sustained by Bishop Scharfenberger, by having Defendant Pofit, as President of the Board with control over the finances of the Corporation, pay for his services to Corporation without oversight. There is further evidence that in 2010, while Defendant Pofit was being paid by the Corporation, Catholic Charities conducted an audit of his billing to the Corporation, raising concerns regarding double billing for his time and how his billable rate was established.
From 2009 through 2019, Defendant Pofit made payments to his company, DCHA, to himself individually, to Diocesan related entities, including the Diocese and Catholic Charities, and to other unknown entities, in excess of $1.1 million from the Corporation's limited assets, despite the fact that the Hospital was closed, and that the Corporation had no operations and no employees. Given Defendant Pofit's authority to pay himself without oversight, the Corporation incurred administrative and legal expenses that Plaintiffs believe to be in excess of $2.3 million, funds that could have been used to pay the pensioners' benefits.
Further, during this same time period, the Corporation filed Form 990s with the IRS given its tax-exempt status. Defendant Pofit, as President of the Corporation, signed the Form 990s for these years, swearing under the penalty of perjury that the Corporation was not engaged in any transactions with a director or officer or any entity owned by a director or officer. He swore to this representation despite the fact that he and his company, DCHA, were parties to a business transaction with the Corporation and he was paying himself and his company large amounts of money from the Corporation's assets for every year from 2009 through 2018. The Form 990s were also inaccurate in that they represented that the Corporation had a written conflict of interest policy, whistleblower policy and document retention policy, none of which appear to exist.
Based on the foregoing, Defendants Perry and Pofit have not met their prima facie burden of demonstrating the absence of any genuine questions of fact entitling them to judgment as a matter of law. Accordingly, their Motion for Summary Judgment is hereby denied in its entirety.
Defendant Pofit's Motion for Summary Judgment (Motion #18)
In support of his Motion to dismiss all claims asserted against him in the OAG action, Defendant Pofit argues that the OAG does not have standing to bring claims for breach of fiduciary duty and violations of the EPTL related to the Plan because the Plan is not a charitable [*19]asset and therefore not subject to the Attorney General's oversight. Defendant Pofit further argues that even if the Court finds that the Attorney General does have standing to sue, he is entitled to statutory immunity from any liability pursuant to NPCL §717(b).
Both of these arguments have already been addressed by the Court above in deciding Defendant Hubbard's Motion and the Motion filed by Defendants Pofit and Perry. To reiterate the Court's findings, the Attorney General has standing to sue in the public's interest as well as assert claims under EPTL §8-1.4, and has the authority to seek monetary damages under NPCL §720(a). See, Ederer v. Gursky, 9 NY3d 514, 525; People ex rel. Cuomo v. Lawrence, 74 AD3d 1705, 1707; Schneiderman v. Lower Esopus River Watch, Inc., 39 Misc 3d 1241(A). The Attorney General's purpose in bringing its separate action is to protect the state's interest to ensure that charitable corporations, like St. Clare's, and their assets, are properly administered and managed for their beneficiaries. The Attorney General's statutory oversight applies to all corporate assets of a not-for-profit corporation, not just those assets that are deemed charitable. See, NPCL §720(a); EPTL §8-1.4(a)(1) and (2). The Attorney General's jurisdiction extends to ensure that the officers, directors and trustees of a not-for-profit corporation fulfill their fiduciary duties to the beneficiaries of the corporation. See, EPTL §8-1.4(m). There is no legal authority for Defendant Pofit's position that the above-cited statutes do not apply to pension plans administered by a nonprofit corporation such as St. Clare's, or that pension plans are somehow exempt or insulated from the prosecutorial authority that the Attorney General derives from these statutory provisions.
With respect to Defendant Pofit's argument that he is entitled to immunity under NPCL §717(b), the Court hereby incorporates its findings set forth above upon which the Motion filed by Defendants Perry and Pofit was denied. To reiterate, whether Defendant Pofit acted in good faith with respect to the administration and management of the Pension Plan remains a question of fact precluding summary judgment. Further, based on the facts described above, there is some evidence suggesting that he did not always follow the advice of Prudential, Milliman, or Attorney McCabe. When he did follow the advice of these professionals, questions remain as to whether it was reasonable to rely on this advice. Given these triable issues of fact, the Court cannot find that, as a matter of law, Defendant Pofit is entitled to qualified immunity under NPCL §717(b) or the common law Business Judgment Rule.
Based on the foregoing, Defendant Pofit has not met his prima facie burden of demonstrating the absence of any genuine questions of fact entitling him to judgment as a matter of law. Accordingly, Defendant Pofit's Motion for Summary Judgment is hereby denied in its entirety.
The Hartshorne Plaintiffs and the Office of the Attorney General ("OAG")'s Joint Motion to Exclude Expert Testimony, Attorney Affidavits and Other Submissions (Motion #19)
Plaintiffs seek an Order excluding in their entirety the Expert Affidavits of G. Daniel Miller, John A. Renken, and Jeffrey Schaff, and the attached reports and opinions contained therein; the Affidavit of Jennifer Hubbard; and the Attorney Affirmations of Timothy J. O'Connor, Esq. and Marshall Broad, Esq., on the grounds that they merely contain legal arguments, are unreliable as they are not based on personal knowledge, and are conclusory without any factual foundation. Although the Court has already considered and specifically addressed the sufficiency of the expert opinions of Mr. Miller, Mr. Renken and Mr. Schaff, or lack thereof, for purposes of deciding the Motions filed by the Diocese and Defendant Hubbard [*20]as set forth above, the arguments raised in support of and in opposition to this Motion warrant further discussion.
With respect to Mr. Miller's expert report and opinion, submitted in support of the Diocese's Motion, Plaintiffs argue that Mr. Miller improperly draws legal conclusions on the ultimate issues, thereby infringing on or usurping the role of the Court who is the exclusive judge of matters of law. Plaintiffs further argue that Mr. Miller's report is unreliable because he does not identify the specific documents and information that he reviewed, or the legal research that he performed in reaching his opinion. Plaintiffs contend that Mr. Miller's opinion is strictly conclusory and speculative, lacks proper foundation, has no probative value, and should be disregarded by the Court and stricken from the record.
Plaintiffs make similar arguments with respect to Mr. Renken's report and opinion, and Mr. Schaff's report and opinion that was submitted in support of Defendant Hubbard's Motion, and request that they be excluded in their entirety without consideration by the Court and arguably, a jury in the event this matter goes to trial. In addition, Plaintiffs argue that Attorney O'Connor's Affirmation is improper as it merely contains legal arguments mirrored in the Memorandum of Law submitted in support of Defendant Hubbard's Motion; alleges facts that are not in the record; and relies on pleadings that have previously been stricken by the Court. Further, Plaintiffs request that Ms. Hubbard's Affirmation be disregarded as it contains legal arguments that she is not qualified to make and alleges facts of which she possesses no personal knowledge. Lastly, Plaintiffs argue that Attorney Broad's Affirmation in support of Defendants Scharfenberger and LeFort's Motion is likewise improper in that it only contains legal arguments and no facts based on personal knowledge and thus, has no probative value.
In opposition to the Motion, the Diocese and Defendant Hubbard argue that it should be denied as untimely and prejudicial in that Plaintiffs failed to file the Motion by the May 1, 2024 deadline pursuant to the Court's Sixth Amended Partial Scheduling Stipulation and Order. This argument is rejected. Plaintiffs have complied with my Individual Part Rules by making their Motion returnable on the same day as the return date of the dispositive motions filed in these matters. Accordingly, it is not untimely.
In further opposition to the Motion, Defendants argue that their submission of expert reports and affirmations are proper. They argue that the attorney affirmations contain a recitation of the procedural history of these matters and the underlying facts, citing to documents in the record to support the same.
Plaintiffs are correct that 22 NYCRR 202.8(c) provides that affidavits in support of a summary judgment motion "shall be for a statement of the relevant facts, and briefs shall be for a statement of the relevant law". However, affidavits that may also include legal argument are not fatal to the motion and need not be stricken from the record. The import of Plaintiffs' Motion is merely that of form over substance. The Court can surely recognize the difference between fact and legal argument regardless of whether one or the other is contained in an affirmation or in a memorandum of law. It would be draconian to strike an affirmation simply because it repeats legal arguments that are advanced in a corresponding memorandum of law. Further, the Court is very familiar with the documentary evidence in the record, including the time frame in which the relevant events occurred. As such, it is clear to the Court who does and who does not have personal knowledge of these events and has considered this fact in deciding the dispositive motions herein.
Defendants also argue that Plaintiffs' Motion must be denied because the Court [*21]previously held that the expert reports of Mr. Miller, Mr. Renken and Mr. Schaff sufficiently identify the information considered and the factual bases for the opinions expressed therein. See, the Court's Letter Decision and Order, dated January 13, 2023. The Court made this ruling in the context of denying Plaintiffs' Motion seeking leave to conduct expert witness depositions.
Consistent with my findings in the Letter Decision and Order, dated January 13, 2023, which is the law of the case, the Reports of Mr. Miller, Mr. Renken, and Mr. Schaff sufficiently identify the information considered and the factual bases for the opinions expressed therein. As such, there is no basis to strike the expert reports outright and for this reason, the Court considered these reports as detailed above. 
To be clear, the Court only considered the expert opinions of Mr. Miller, Mr. Renken and Mr. Schaff in the context of whether Defendants satisfied their prima facie burden entitling them to summary judgment. The Court's determination that the expert opinions were not sufficient to satisfy Defendants' respective burdens should not be interpreted to mean that these opinions are inadmissible at trial. "The admissibility and scope of expert testimony is addressed to the trial court's sound discretion and will not be disturbed on appeal, absent an abuse of that discretion or an error of law." Kingsley Arms Inc. v. Kirchhoff-Consigli Constr. Mgmt., LLC, 173 AD3d 1506, 1507. Thus, it will be up to the Court to decide at trial, where Plaintiffs will have the burden of proof, whether to admit or exclude the testimony of Defendants' experts.
Accordingly, Plaintiffs' Motion to Exclude Expert Testimony, Attorney Affidavits and Other Submissions is hereby denied in its entirety. 
The parties' remaining arguments, to the extent not specifically addressed herein, have been considered and found to be unavailing.
Based on all the foregoing, the Diocese's Motion for Summary Judgment (Motion No. 13) is hereby denied in its entirety. Defendant Hubbard's Motion for Summary Judgment (Motion No. 14) is hereby denied in its entirety. Defendant Scharfenberger and Defendant LeFort's Motion for Summary Judgment (Motion No. 15) is hereby denied in its entirety. The Hartshorne Plaintiffs' Motion for Partial Summary Judgment against St. Clare's Corporation (Motion No. 16) is hereby granted. The Court hereby awards Judgment in favor of the Hartshorne Plaintiffs and against the Corporation in an amount to be calculated that is consistent with the Court's above findings, with pre-judgment statutory interest at the rate of 9% from February 1, 2019 to the date of the Judgment, and thereafter until paid in full. The Hartshorne Plaintiffs are hereby directed to submit a proposed Judgment, on notice to Defendants. Defendant Perry and Defendant Pofit's Motion for Summary Judgment (Motion No. 17) is hereby denied in its entirety. Defendant Pofit's Motion for Summary Judgment (Motion No. 18) is hereby denied in its entirety. Plaintiffs' Joint Motion to Exclude Testimony and Affidavits (Motion No. 19) is hereby denied in its entirety. Given the length of time this matter has been pending, the Court hereby schedules a virtual Conference, to be held via Microsoft Teams, on Thursday, May 29, 2025, at 11:00 a.m., for the purpose of setting a date certain for a Jury Trial on the remaining issues.
The foregoing shall constitute the Decision and Order of this Court.
Signed at Schenectady, New York, this 14th day of May, 2025.
Hon. VINCENT W. VERSACI
Acting Supreme Court Justice
ENTER:

Footnotes

Footnote 1:"St. Clare's Hospital of Schenectady, NY", "the Hospital", "St. Clare's", "St. Clare's Corporation" and "the Corporation" shall be used interchangeably throughout this Decision and Order.

Footnote 2:A church plan exemption from ERISA is limited to a plan "established and maintained . . . for its employees . . . by a church." ERISA §3(33)(B) and (C).

Footnote 3:This Court previously held that "only the 2000 Amended and Restated Plan and the 2005 SPD apply herein". Hartshorne v. Roman Catholic Diocese of Albany, 68 Misc 3d 849, 857-858, aff'd, 200 AD3d 1427.

Footnote 4:Although the Hartshorne Plaintiffs seek a Judgment against the Corporation on behalf of all Plan participants, they have not provided any legal authority for the Court to grant a Judgment to individuals who are not parties to this action.